IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



United States Courts
Southern District of Texas
ENTERED

SEP 1 4 2004

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-00-377 |
| | § | CIVIL ACTION NO. H-03-2174 |
| JIMMIE SMITH, | § | |
| | § | |
| Defendant-Movant. | § | |

### MEMORANDUM AND RECOMMENDATION GRANTING GOVERNMENT'S MOTION FOR SUMMARY DISMISSAL AND DENYING MOVANT'S § 2255 MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Jimmie Smith's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.165) and Memorandum in Support of § 2255 Motion (Document No. 167), the United States' Answer and Motion to Dismiss (Document No.170), the United States' Supplemental Response (Document No. 171), and Movant's Reply to the United States' Motion to Dismiss (Document No. 172). Having considered Movant Jimmie Smith's § 2255 Motion to Vacate, Set Aside or Correct Sentence, the United States' Motion to Dismiss, Movant's Response to the Government's Motion to Dismiss, the record of the proceedings before the District Court in the underlying criminal case, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the United States's Motion for Summary Dismissal (Document No. 170, 171) be GRANTED and that Movant Jimmie Smith's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 165) be DENIED.

1

# I.    Procedural History

Movant Jimmie Smith ("Smith"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255. This is Smith's first attempt at § 2255 relief.

On June 5, 2000, Smith and three co-defendants, James Smith, Jorge Collazo, and Donshay Sayles, were charged by indictment with aiding and abetting the possession with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 18 U.S.C. § 2 (count one); and conspiracy to possess with intent to distribute fifty grams of cocaine base between May 1, 2000, and May 15 , 2000, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846 (count two) (Document No. 1). On January 25, 2001, Smith pleaded guilty to counts one and two of the indictment without the benefit of a written plea agreement (Document No. 101;and Transcript of Rearraignment Hearing, Document No. 149). The court ordered that a presentence report ("PSR") be prepared (Document No. 102). A final PSR was filed on April 4, 2001, pursuant to which Smith's guideline sentencing range was calculated as follows: (1) In calculating Smith's base offense level, Smith was held accountable for 388 grams of cocaine powder and 71.8 grams of cocaine base, which was the equivalent of 1,513.6 kilograms of marijuana and which under U.S.S.G. § 2D1.1(c)(4), gave Smith a base offense level of 32; (2) Because Smith possessed a dangerous weapon during the offense under U.S.S.G. § 2D1.1(b)(1) his base offense level was increased by two levels to an adjusted offense level of 34; (3) Because Smith occupied a position of an organizer or leader of a criminal activity that involved five or more participants, under U.S.S.G. § 3B1.1(a), his offense level was increased by four levels to an adjusted offense level of 38; (4) Because Smith accepted responsibility for his criminal conduct and informed the Government of his desire to plead

guilty, his adjusted offense level was reduced by three levels under U.S.S.G. § 3E1.1(a) and (b) for

an adjusted offense level of 35; (5) With a total adjusted offense level of 35, and a criminal history

category of V, Smith had a guideline sentencing range of 262 to 327 months imprisonment.

(Document No. 128). Smith filed written objections to the PSR[1], and in connection therewith, moved

for a downward departure under U.S.S.G. § 5K2.12.[2] (Document No. 109).

On April 6, 2001, the district court sentenced Smith to concurrent terms of 295 months

imprisonment on counts one and two, to be followed by concurrent five year terms of supervised

release on counts one and two, and imposed the mandatory $200 special assessment (Document No.

130, Transcript of Sentencing Hearing, Document No. 156). Judgment was entered on April 6, 2001.

(Document No. 133).

On April 9, 2001, Smith timely filed his Notice of Appeal to the Fifth Circuit Court of

Appeals appealing his conviction and sentence (Document No. 136). Smith argued that (1) the district

court erred in ruling that he was an organizer or leader of a criminal activity involving five (5) or

more participants under USSG § 3B1.1(a); and (2) *Apprendi* and its progeny require that he be

resentenced because the drug quantity and his two sentencing enhancements (organizer/leader

---

[1]Smith objected to the PSR under *Apprendi v. New Jersey,* 530 U.S. 466 (2000). According to Smith, the offense section of the PSR overstated his role in the drug trafficking activities. Also, Smith objected to the two level upward adjustment based on the firearm possessed by co-defendant, Collazo. According to Smith, because he had never met or spoken with Collazo prior to their meeting at Sayle's home, he had no reason to believe Collazo had a firearm. Further, Smith objected to a four level upward adjustment based on his role as an organizer/leader. Finally, Smith made a global objection to all guideline enhancements under *Apprendi.* (Document No. 109).

[2] According to Smith, he was eligible for a downward departure under U.S.S.G. § 5K2.12 because the Confidential Informant coerced/pressured Smith and his brother to participate in the drug trafficking activities. (Document No. 109).

enhancement and possession of a firearm by a co-conspirator) increased his minimum sentence. On February 6, 2002, the Fifth Circuit affirmed Smith's conviction and sentence in an unpublished opinion (Document No. 160). *United States v. Smith*, 31 Fed. Appx. 839, 2002 WL 261523 (5th Cir.) *cert. denied*, 536 U.S. 933 (2002). With respect to Smith's contentions, the Fifth Circuit wrote:

> Jimmie Smith appeals his sentence for aiding and abetting the possession with intent to distribute cocaine base and conspiracy to distribute cocaine base. He contends that the district court erred in finding that he was a leader or organizer of a criminal activity that involved five or more participants pursuant to U.S.S.G. § 3B1.1(a). He also contends that he should be resentenced in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny because the factors used to enhance his sentence were not presented to a jury and proved beyond a reasonable doubt.

> The facts presented in the presentence report and the testimony at the sentencing hearing support the district court's finding that Smith was an organizer or leader of a conspiracy to distribute crack cocaine. *See United States v. Glinsey*, 209 F.3d 386, 396 (5th Cir.), *cert. denied*, 531 U.S. 919 (2000). Moreover, Smith did not specifically object to the district court's factual finding, implicit in its adoption of the presentence report, that the activity involved five or more participants, and his argument in this regard is therefore reviewed for plain error. *See United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994). The facts set forth in the presentence report support the inference that at least five people willfully participated in and were criminally responsible for the drug activity, and thus Smith has not shown that the district court plainly erred in finding that the criminal activity involved five or more participants pursuant to U.S.S.G. § 3B1.1(a).

> Smith concedes that his *Apprendi* argument is foreclosed by *United States v. Clinton*, 256 F.3d 311 (5th Cir. 2001). He raises the issue to preserve it for further review. (Document No. 160).

The Fifth Circuit issued its mandate on February 28, 2002 (Document 159). Smith filed a petition for a writ of *certiorari* with the United States Supreme Court, which was denied by the Supreme Court on June 17, 2002, (Document No. 164). Smith's conviction was therefore final on that date, and the one-year statute of limitations period for filing a § 2255 motion began on June 17, 2002, and ended on June 17, 2003. The instant § 2255 Motion to Vacate, Set Aside or Correct Sentence was

stamped by the Clerk as filed on June 19, 2003 (Document No. 165), two (2) days beyond the expiration of the one-year statute of limitations period. Smith's § 2255 motion, however, shows that it was signed on June 13, 2003 (Document No. 165), five (5) days before the expiration of the one-year statute of limitations period for filing a § 2255 motion. It must first be determined whether Smith's § 2255 motion was timely filed on or before June 17, 2003.

The Fifth Circuit has held that a federal conviction becomes final for purposes of the Antiterrorism and Effective Death Penalty Act of 1996's ("AEDPA") one-year limitation period when the Supreme Court denies the petition for writ of *certiorari*. *Giesberg v. Cockrell*, 288 F.3d 268, 270 (5th Cir. 2002) (citation omitted). "A party whose complaint reaches the Clerk after the statute of limitations has expired ordinarily cannot maintain a lawsuit, even if the complaint was placed in the mail during the limitations period." *Higgenbottom v. McManus*, 840 F. Supp. 454, 455 (W.D. Ky. 1994) (citing Fed. R. Civ. P. 3 & 5(e)). However, the Supreme Court has demonstrated a willingness to extend a special "mailbox rule" to persons who are incarcerated and are filing their legal documents *pro se*. *Houston v. Lack*, 487 U.S. 266, 276 (1988). Although the *Houston* opinion applied this exception to the filing of notices of appeal, the First, Fourth, Fifth, and Ninth Circuits have extended the rule to include complaints filed by prisoners *pro se*. *See Morales-Rivera v. United States*, 184 F.3d 109, 110 (1st Cir. 1999); *Lewis v. Richmond City Police Dep't.*, 947 F.2d 733, 735-736 (4th Cir. 1991); *Sonnier v. Johnson*, 161 F.3d 941, 945 n.2 (5th Cir. 1998); *Hood v. Galaza*, 47 F. Supp. 2d 1144, 1151 (S.D. Cal. 1999). Under the prisoner mailbox rule, a prisoner's *pro se* complaint is deemed filed when delivered to prison authorities for mailing to the court. *Houston*, 487 U.S. at 276. The mailbox rule is premised on policy concerns surrounding a *pro se* prisoner's lack of control over delays between the prison authorities' receipt of the notice and its formal filing with the court. *Id.*

at 273-76. The Fifth Circuit has held if a *pro se* prisoner's notice of appeal or habeas petition is received by the district court within two (2) business days after the last filing, it is to be treated as timely filed as the court will presume that it was timely delivered for mailing via the prison mail system. *Sonnier*, 161 F.3d at 945 (citations omitted). Here, because Smith's § 2255 motion was stamped filed by the District Clerk on June 19, 2003, which was two (2) days after the last day for filing, the presumption of timely delivery to the prison authorities applies. *Id.* As such, Smith's § 2255 motion is deemed to have been timely filed.

## II.     Issues

Smith raises three claims in this proceeding:

1.     His guilty plea was made unknowingly and involuntarily;

2.     The guilty plea violated his due process rights because he was unaware of the nature of the charges against him and unable to understand the elements of the offense; and

3.     His counsel was ineffective in failing to adequately inform him of the consequences of his guilty plea; allowing him to plead guilty to conspiracy, which triggered the firearm enhancement; failing to advise him of the defense of entrapment; and making a misrepresentation of his probable sentence.

## III.     Discussion

A federal prisoner may challenge his conviction on the basis that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255 (2000). Motions brought pursuant to

§ 2255 are reserved for claims of constitutional or jurisdictional significance. *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981); *Limon-Gonzalez v. United States*, 499 F.2d 936, 937 (5th Cir. 1974).

## A. Procedural Bar

When claims of constitutional or jurisdictional import are not raised on direct appeal, the claims are procedurally defaulted, and can only be considered in a § 2255 proceeding if a movant can show both cause for his failure to raise his claims on appeal, and actual prejudice resulting from the alleged errors. *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) ("[A] defendant who raises a constitutional or jurisdictional issue for the first time on collateral review must show both cause for his procedural default and actual prejudice due to any such errors."); *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996) ("When raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error."); *United States v. Acklen*, 47 F.3d 739, 741-42 (5th Cir. 1995) ("Because a challenge under section 2255 'may not do service for an appeal,' a movant may not raise constitutional or jurisdictional issues for the first time on collateral review without establishing both 'cause' for his procedural default and 'actual prejudice' resulting from the error."); *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) ("A defendant can challenge his conviction after it is presumed final only on issues of constitutional or jurisdictional magnitude . . . and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error."), *cert. denied*, 502 U.S. 1076 (1992). Alternatively, procedurally defaulted claims can be considered for the first time in a § 2255 proceeding if the movant can show that he is actually innocent. *Bousley v. United States*,

523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice' . . . or that he is 'actually innocent.'").

Ineffective assistance of counsel claims need not be raised on direct appeal and can be properly raised for the first time in a § 2255 motion. *See Massaro v. United States*, 538 U.S. 500, 509 (2003). As such, ineffectiveness of counsel claims are generally not subject to the procedural default rule. *Gaudet*, 81 F.3d at 589 & n.5.

In this case, even though Smith filed a direct appeal, none of the claims that Smith raises herein concerning the voluntariness of his guilty plea and effectiveness of counsel were raised on the initial review by the Fifth Circuit. In this case, Smith maintains that counsel's ineffectiveness is the "cause" for his failure to challenge his guilty plea on direct appeal. Smith, however, cannot establish that counsel's failure to raise the claims on appeal prejudiced him, or that the result of the appeal would have been different. In addition, Smith has not asserted that he is actually innocent of the offense to which he pleaded guilty. Accordingly, Smith's challenges to his guilty plea (grounds one and two) are procedurally barred from review. Moreover, even if the claims concerning the voluntariness of his guilty plea were not procedurally barred and Smith had argued on appeal that his plea was unknowing and involuntary, Smith's challenges to his guilty plea are not supported by any evidence and are refuted by the record.

**1. Guilty Plea Claims (Claims one and two).**

At Smith's Rearraignment on January 5, 2001, the Court engaged in an extended colloquy to ensure that Smith was fully satisfied with his counsel (Document No. 149, p. 3); that the plea was not the result of promises or coercion (Document No. 149, p. 4); that Smith fully understood the

charges against him (Document No. 149, p. 3); the maximum penalties and the process by which his sentence would be calculated (Document No. 149, pp. 4-8); the rights he was waiving (Document No. 149, pp. 8-10); the elements of the offenses (Document No. 149, pp. 10-12); and the factual basis of the plea (Document No. 149, pp. 12-15). In particular, with respect to the maximum penalties and elements of the offenses, the following colloquy took place:

> The Court: Have you received a copy of the indictment pending against you, that is, the written charges that have been brought against you in this case?
>
> The Defendant: Yes.
>
> The Court: And have you discussed those written charges and the case in general with Mr. McGuire, your attorney?
>
> The Defendant: Yes, I have.
>
> The Court: Are you fully satisfied with the counsel, representation and advice given to you in this case by Mr. McGuire as your attorney?
>
> The Defendant: Yes, I have.
>
> The Court: Now, it is my understanding there is no plea agreement. Is that correct?
>
> Mr. Cook: That's correct.
>
> Mr. McGuire: That's correct.
>
> The Court: Has anyone made any promises, Mr. Smith, or assurances to you of any kind in an effort to persuade to you [sic] plead guilty in this case?
>
> The Defendant: No, ma'am.
>
> The Court: Has anyone in any way attempted to force you to plead guilty in this case?
>
> The Defendant: No.

The Court:  Do you understand that the offenses to which you're pleading guilty are felony offenses, and that if [your] plea is accepted by the Court, you will be adjudged guilty of those offenses and such adjudication may deprive you of valuable civil rights, such as the right to vote, right to hold public office, right to serve on a jury and the right to possess a firearm?

The Defendant:  Yes.

*    *    *

The Court:  Let's talk about the penalties now that you are facing, the maximum penalties you're facing, as a result of your plea of guilty this morning.

You're pleading guilty to Count One which is possession of a controlled substance with intent to distribute, and Count Two, conspiracy to commit possession of a controlled substance with intent to distribute.

The penalties for each of those crimes is imprisonment of not less than ten years nor more than life and a fine not to exceed four million dollars.  Now, there would also be supervised release of at least five years for each of those crimes.

Along with that supervised release, there would be conditions of supervised release which you would have to follow.  And if you failed to follow those, you could be put back into prison for some period of time without any credit for the time you had already served.  And then there would also be a special assessment of $100 for each count for a total of $200 for the two counts.

Do you understand that those are the maximum possible penalties you're facing as a result of your plea of guilty this morning?

The Defendant:  Yes, ma'am.

The Court:  Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow to determine what the sentence will be in a criminal case.

Have you and Mr. McGuire talked about how those guidelines may apply in your case?

The Defendant: Yes, we were talking about it.

The Court: Do you understand that I don't know today what your sentence will be?

The Defendant: Yes, ma'am.

The Court: And I won't know until a Probation Officer has done an investigation of your case and has written a pre-sentence report. You and Mr. McGuire and Mr. Cook will be given a copy of that report and you will be given an opportunity to make any objections you may have to that report.

You will then have a sentencing hearing, and at that hearing, I will rule on any objection that may be made by the Government or by you. I will also rule on any motions that may be made, any recommendations that may be made or any other matters that may come to my attention that may have some impact on what kind of sentence you are going to get.

At the conclusion of that hearing, I would then be in a position to determine how the guidelines apply in your case and what your guideline sentence is.

Do you understand that is how the process works?

The Defendant: Yes, sir.

The Court: Do you understand that it could be that at the time of sentencing, I give you a sentence that is more severe than the one you're expecting to get after you and Mr. McGuire talked about how the guidelines apply. Do you understand that?

The Defendant: Okay, yes.

The Court: And if the sentence I give you is more severe than the one you're expecting to get today, you will not be given a chance to withdraw your plea of guilty at the time of sentencing. Do you understand that?

The Defendant: I do. (Defendant confers with Attorney).

The Court: Because of the nature of the crimes you have been

accused of and that you're intending to plead guilty to, there is a statutory requirement which was referred to as the mandatory minimum requirement which means that no matter what your guidelines sentence may work out to be, I would still be required to give you a sentence of at least ten years. Do you understand that?

The Defendant: I do.

The Court : So we have the guidelines that we have to work with and then we also have, because it is a drug offense, we have the mandatory minimum statute we also have to work with and that kind of overrules the guidelines in some instances. Do you understand that?

The Defendant: Yes, ma'am.

*             *             *

The Court: I want to go over with you the essential elements of the two crimes you're pleading guilty to so that I can be sure that you understand what it is you're pleading guilty to okay.

*             *             *

Let's go back.... You have been charged with aiding and abetting in the possession which means helping someone else to posses it. [It] would be you or someone else you were helping possessed the controlled substance, and that substance was cocaine base. And you or someone else possessed the substance with the intent to distribute it, and the cocaine base weighed 50 grams or more, and that you helped that person out. If another person possessed it, you helped that person out to possession [sic] it with intent to distribute.

Do you understand what I'm saying?

The Defendant: I hear you, yes, ma'am.

The Court: All right. Count Two, was he charged with conspiracy?

Mr. Cook: Yes, that's correct.

The Court: Count Two is conspiracy to commit possession of a controlled substance with intent to distribute which is 21, United

States Code, Section 841(a)(1) and 841(b)(1)(A)(3)(i) and 846. The essential elements of that crime are, first, a conspiracy existed, that is, there was an agreement between two or more persons to violate the narcotics laws of the United States. Second, you, Jimmie Smith, knew of the agreement, and third, you, Jimmie Smith, knowingly or intentionally joined in that agreement.

Do you understand those are the essential elements of Count Two, conspiracy to commit possession of a controlled substance?

The Defendant: Yes, ma'am.

The Court: All right. Mr. Cook, tell me what is it the Government is prepared to prove if we went to trial in the case?

Mr. Cook: On May 9, 2000, Your Honor, undercover officers met with the defendant and his brother to discuss negotiations of a crack cocaine deal involving 25 cookies of crack cocaine. They agreed to try and do the deal the next day which would have been May 10, 2000. However, that fell through as the source for that cocaine was arrested on an unrelated charge.

There were telephone conversations between May 9 and May 15. They continued to negotiate and try and set up the deal.

On the 15th, the defendant, the defendant's brother and the undercover met again at the same location, being a Shoney's Restaurant on 610 South, and discussed the deal and were led--the undercover was led then to a second location in southwest Houston, being an Albertson's parking lot, where negotiations continued.

At that location, Donshay Sayles, co-defendant, arrived at the scene in a black pickup. There were discussions between the defendant and Mr. Sayles. Eventually, the undercover, this defendant, Jimmie Smith, and Mr. Sayles met at a house on Lima Street in southwest Houston.

At that location, co-defendant Jorge Collazo also was at the house. At that location, Defendant Collazo produced cocaine and approximately one pound of powdered cocaine. The deal was to be concluded there in the house and it was presented to the undercover at that point for sale purposes.

13

Officers went into the location. There were shots fired. The defendant was taken into custody. Seventy-one grams of crack cocaine were recovered, field tested positive and lab tested positive, 388 grams of powdered cocaine were recovered, field tested positive and lab tested positive.

The defendant eventually gave a statement stating that he was introduced to the confidential source through his brother and that he was looking for product, meaning cocaine. Mr. Smith state[d] that he had met with the undercover, his nephew, at Shoney's and they had arranged to do the deal on the 9th, but that he could not find a product or cocaine for them.

Mr. Smith stated that he contacted Shorty or Donshay Sayles, co-defendant, who said he might know someone who would handle it. Mr. Smith here stated that he and the undercover went to the Shoney's, then to Shorty's house where the deal was supposed to occur.

Once in the home, Jimmie Smith, Donshay Sayles and the undercover met with the Jorge Callazo, who had the cocaine.

The Court: Mr. Smith, tell me in your own words what is it you did to commit the crimes that you're pleading guilty to this morning?

The Defendant: In my own words?

The Court: Yes, sir.

The Defendant: What I did, Your Honor, I took Speedy's nephew from Point A to Point B. That is what I did. That was my involvement altogether.

Now, what was negotiated, what was agreed upon, I had nothing to do with that but I did take a person from Point A to Point B.

The Court: And you knew why?

The Defendant: I knew why I was taking them, yes, I did.

(Document No. 149, pp. 3-8, 10-15).

Because it is clear from the record that Smith understood the nature of the charges, understood the consequences of pleading guilty, was aware of the penalties, understood the elements of the offenses and the factual basis of the plea, and given that Smith's statements in open court carry a strong presumption of verity, *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977), Smith's challenge to the voluntariness of his guilty plea (ground one) and due process challenge to his guilty plea (ground two) based on his contention he did not understand the elements of the charged offense are without merit.

## 2. Ineffective Assistance of Counsel Claims

Smith claims that his counsel was ineffective for failing to properly estimate his sentence and failing to review the prosecution's files. In order to establish ineffective assistance of counsel, Smith must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668,689-94, (1984). With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Thus, Smith "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Strickland*, 466 U.S. at 687-89. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id.* at 693-95. A

petitioner must establish both the deficiency and the prejudice prongs of *Strickland* in order to be entitled to habeas relief. *Id.* at 687.

Judicial scrutiny of counsel's performance will be "highly deferential" and "a strong presumption " will be made "that trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992) (citing *Strickland*, 466 U.S. at 689). In order to overcome the presumption of competency, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Finally, "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."*Id.* at 691; *see also Lincecum v. Collins*, 958 F.2d 1271 (5th Cir. 1992).

Constitutionally effective assistance of counsel is not errorless counsel. *Baldwin v. Maggio*, 704 F.2d 1325, *cert. denied*, 467 U.S. 1220 (1984). The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. *Id.* Each case is judged in the light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Id.* The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland*, 466 U.S. at 689-90. Counsel will not be judged ineffective only by hindsight. *Id.*

According to Smith, his counsel gave him incorrect and misleading information, on which he relied, causing him to believe that he would receive a sentence of four or five years, which was far shorter than the sentence actually imposed. Smith expected his sentence to be based on the

charge of aiding and abetting the possession of crack cocaine and conspiracy to possess with intent

to distribute crack cocaine but instead his sentence included enhancements for the firearm, which

he had no knowledge of, and his leadership role in the offense. Smith also alleges that his counsel

failed to review the prosecution's files.

In response, the United States has attached to its Motion to Dismiss (Document No. 171,

Attachment A) an affidavit of Smith's attorney, Kenneth W. McGuire, in which counsel states:

> I was attorney of record for Jimmie Smith in *United States v. Jimmie Smith, et al,*
> Cause No. H-00-377, United States District Court of the Southern District of
> Texas. I have reviewed Jimmie Smith's "Memorandum of Law to Support of §
> 2255" and the allegations contained therein.
>
> Specifically, I have reviewed the allegations that "counsel was not familiar with the
> facts of the case or the law. So he could not advise Movant of the options available.
> Counsel advised Movant to plea guilty without a plea agreement to a charge of
> conspiracy that would leave Movant open to be charged with the shooting of his co-
> defendant and with possession of the weapon that his co-defendant possessed.
> Counsel advised Movant to plea guilty to an charge where the government had
> made Movant the leader and organized which almost ensured that Movant
> sentence would be enhanced. Counsel did not make an investigation of potential
> defenses so that Movant could make an informed decision on whether to plea
> guilty or not guilty.....Movant plea of guilty could not have been knowingly and
> voluntary because his counsel gave him material misadvise. Like pleading guilty
> without a plea agreement, pleading to a conspiracy instead of possession, and did
> not try to use entrapment as a defense theory."
>
> I advised Jimmie Smith that his Sentencing Guideline range for aiding and abetting
> and conspiracy to possess with intent to distribute the crack and powder cocaine
> found at the scene of his arrest with his co-defendants would begin at an offense
> level of 32 before other enhancements were possibly applied, as was in fact found
> in his Presentence Report ("PSR"). This base offense level would be no different
> whether Mr. Smith pled guilty to the aiding and abetting count or to the conspiracy
> count.
>
> Because of Mr. Smith's two prior felony convictions for narcotics possession, the
> federal prosecutor assigned to Mr. Smith's case advised me that the government
> would file a 21 U.S.C. § 851 enhancement against my client if he went to trial,
> subjecting Jimmie to a mandatory sentence of life imprisonment if convicted, but

that they would not do so if he entered a plea of guilty.

I conducted a very thorough investigation of the facts and law applying to Mr. Smith's case. I discussed the option of going to trial and pursuing an entrapment defense with Mr. Smith, based on the acts of the CI "Speedy," which I found to be reprehensible. As Mr. Smith admits, the CI "Speedy" was deactivated by DEA as a CI "due to Movant counsel uncovering the fact that he had committed perjury on a prior trial in a Houston court in the case styled United States v. James A. Woodley, Crim. No. H-99-464-S (S.D. Texas 2000)." However, my advice to Mr. Smith was that the risk of receiving a mandatory life sentence at trial was too great, but that the decision whether to plead guilty or go to trial was his.

I also advised Mr. Smith that if found guilty he would most likely receive a +2 point enhancement for possession of a firearm due to his co-defendant Collazo's brandishing a firearm at an undercover officer immediately before their arrest. Mr. Smith faced the risk of being enhanced for the possession of a firearm during the offense regardless of whether he plead guilty with or without a plea agreement. Because of a question as to whether one of Mr. Smith's prior cocaine possession convictions would be considered a consolidated sentence under U.S.S.G. § 4A1.2, cmt. (n.3), and therefore not separately counted for criminal history purposes, I advised Mr. Smith that his criminal history category would most likely be Category IV. This conviction was counted, however, because no formal consolidation order was entered by the state district court, even though these two cases were heard on the same date for sentencing and the sentences were ordered concurrent to each other by the sentencing judge.

I did not advise Mr. Smith that he would be subject to an organizer/leader enhancement, or any other role enhancement, because I believed the most direct authority factually on point with Mr. Smith's case, *United States v. Sostre,* 967 F.2d 728, 733 (1st Cir. 1992), *United States v. Allred,* 144 F.3d 1405, 1422 (11th Cir. 1998), and *United States v. Graham*, 162 F.3d 1180 (D.C. Cir. 1998), would deny the application of the organizer/leader enhancement in his case. As the *Graham* court held, "mere act of directing buyers to sellers does not constitute management or supervision warranting an enhancement. Chapter 3B1.1(d) targets managers, not concierges and bellhops." The district court disagreed with my vehement objections to this factual finding, however, and imposed an extremely high sentence on my client.

Given all of the facts of Jimmie Smith's case, I believe that his sentence of 295 months constitutes an extreme injustice to him and to the sense of public fairness, particularly when compared with the sentence of his brother and co-defendant, James Smith, who received an extremely lenient sentence of 48 months, and who

was at least as culpable as Jimmie.  James in fact was originally approached by the DEA CI and then directed him to Jimmie to obtain the drugs.  Jimmie's brother James was going to receive an equal 'commission' with Jimmie for introducing the players, indicating their equal respective roles, yet he received a sentence of 4 years and Jimmie received a sentence of more than 24 years.

(Document No. 171, Attachment A).  As to specific examples of ineffective assistance which Smith cites in support of his ineffectiveness claims, such as that he was not aware of the charges against him, that he was not aware of the consequences of his guilty plea, that counsel failed to review the file, and that he was misled about the length of his sentence, the record either affirmatively shows that Smith's counsel was not deficient or there is no evidence that the alleged errors prejudiced Smith within the meaning of *Strickland*.

The record of the Sentencing Hearing shows that Smith acknowledged what the consequences of his guilty plea were, as read to him by the Court, and admitted to discussing it with counsel:

The Court: Mr. Smith, have you had a chance to read over the presentence report that's been filed in this case?

The Defendant: Yes, ma'am.

The Court: All right.  And have you talked about the report with Mr. McGuire?

The Defendant: Yes, I have.

The Court: Do you feel like you understand everything in it?

The Defendant: Yes, we went over the PSI [sic].

The Court: All right.  Now, Mr. McGuire has filed a number of objections and I just want to find out from you if you have any additional objections that you would like to make to the report, any objections that Mr. McGuire has not made.

The Defendant: As far as I know, he made the ones that we went over.

The Court: All right. So, you don't have any others that you would like to voice at this time?

The Defendant: Not at this time.

(Transcript of Sentencing Hearing, Document No. 156, pp. 3-4)

Likewise, Smith's claim that the guilty plea was involuntary because it was based on counsel's misrepresentations about a likely sentence of four to five years or at most ten years is defeated by his sworn testimony at the Rearraignment hearing. Smith unequivocally stated that he understood he had been in no way guaranteed a particular sentence. Smith repeatedly acknowledged that he understood that no one could tell him with specificity the length of sentence which would be imposed by the Court. Smith stated that he knew he could be sentenced up to the maximum penalty, which was up to life but which, nonetheless, was considerably less than receiving a *mandatory* life sentence had the matter proceeded to trial and the government filed a 21 U.S.C. § 851 enhancement. Moreover, counsel objected, in writing and at the Sentencing Hearing, to the calculation of his sentence, and in particular the enhancement for the firearm and for his leadership role in the offense. Also, counsel moved for a downward sentencing departure based on Smith being entrapped to participate in the offense by the confidential informant. Indeed, the record shows that at the Sentencing Hearing, counsel presented testimony and legal argument concerning his objections to the sentencing enhancements based on the firearm and Smith's role in the offense. For example:

Mr. McGuire: Let's see. The objection also is in there, Your Honor, for the purposes of informing the Court of how this whole transaction occurred, just so the Court is fully informed of what happened. And all the details are laid out in my written objections, basically that it took a year for this offense to come to fruition through the persistent activities of the confidential informant, which I believe were evidenced by the letter that he wrote a year before the arrest occurred. And we believe that's relevant certainly to his level of culpability in the offense, his

willingness to do the offense from the beginning. It's relevant to the downward departure request that we made. And it would be relevant, I believe, in where the judge--where Your Honor would fee--what part of the guidelines range would be appropriate in this case...

*        *        *

Mr. McGuire: I don't believe there is, Your Honor. It's relevant, however, in the [sic] on recommendation in the presentence report that Jimmie Smith was an organizer/leader of this offense. The first person to be brought into this offense and the first person to start recruiting other people in this offense was James Smith, who was recruited beginning with the DEA informant's attempts in jail. This isn't the only letter he wrote.

I have another letter here, which I would like to attach and put into the record, which I was given by another defense attorney, in this same hand of the DEA informant, written at approximately at the same time to another person in a separate case who was also ultimately set up and was convicted. It was Joe Eddie Taylor, who was tried in Judge Werlein's court. It just shows a pattern, Your Honor, of what he was doing; and, again, I think it goes to the degree of culpability in this case.

The Court: Okay. All right. But I think that the information that the probation officer has put into the report--I understand you have some more background and that you've got it written down here. But as far as the information that the probation officer has put into the report, I think that's accurate information and I'm going to overrule your objection to Paragraph 4.

Then we go to Paragraph 5, that you contend that he did not--Mr. Smith did not agree to meet with the undercover officer on May 10th to sell 25 ounces of crack cocaine.

Mr. McGuire: Right. This goes back, Your Honor, to our objection or our--the facts that we believe actually occurred, that Mr. Smith's role was that of what's called a steerer or you could call it a broker. That is, someone who's asked to put --find a buyer--put buyer and seller together, not someone who sells drugs themselves, not someone who has possession of drugs which to sell, but just someone who's asked to go out and find someone.

That is relevant to the issue of the organizer/leader enhancement, which I would argue that if you are just a steerer--and the cases I cite in there, the *Sostre* case from the Second Circuit, which is factually almost identical to Mr. Smith's case, that you can't be an organizer or leader. You're really just a gofer. You're not

21

the head of the organization. You don't control others. You don't order others around. You don't punish them. You don't get a bigger share of the proceeds. And that's why it's in there, to inform the Court about that.

*   *   *

Mr. McGuire: Our argument on that, Your Honor, would just be that Mr. Smith had never met Mr. Collazo before. He met him only that night. He had no idea that he had a weapon. He wasn't in the kitchen when the transaction was occurring. He was in the living room. It's probably just a matter of coincidence that he was in the house and James Smith was not. And we just--he had no idea, and he would be willing to testify to that, that there was a gun present, that there would be a gun present.

And we feel that if James Smith, who actually was more--originally brought Jimmie Smith, his brother, into this whole transaction is not held responsible for that in some way, we believe it might be injustice--it would be injustice to apply that to him just because he happens to be in the house.

*   *   *

Mr. Cook: Your Honor, historically firearms have been ruled by the courts repeatedly to be a tool of the drug trade for protection and other things that certainly are involved in the drug trade, protection of the drugs themselves, protection of turf. Certainly if you set up a deal for which you believe to be 25 ounces of crack cocaine, it's reasonable [sic] foreseeable that someone in that group would bring a gun to that situation.

There was a meeting between the defendant and the undercover outside the house where he assured the officer that everything would be safe; but when they get into the house, even in the defendant's own statement, he states that he overheard the defendant Collazo stating that he was serious, he had a gun. And in his own statement he says at that point I moved away and went and sat on the couch. Up to that point, according to his own statement, he was there present. He knew the defendant had a gun at that point. And it is foreseeable for anyone involved in a drug deal of this magnitude to believe that someone is going to bring a weapon to that situation.

The Court: I agree.

Mr. McGuire: If I could respond to that, Your Honor.

The Court: Sure.

Mr. McGuire: If James Smith, who was essentially as equally culpable in this offense or certainly charged originally with conspiracy and with aiding and abetting just like Jimmie Smith, who was actually originally approached and recruited Jimmie Smith in this whole endeavor and he was not held responsible, I don't see how a distinction could be made between the two just by--Jimmie-- James Smith went to the house that same night, and I believe he just sat outside by a quirk of fate for whatever reason. And if he was not held responsible for that firearm, it would seem not to make any sense to hold Jimmie either, because they have an equal degree of involvement. Perhaps James Smith has even more involvement, because he recruited Jimmie Smith. He was offered a very good deal, which he accepted through his attorney, that was not offered to Jimmie Smith; but other than that, they would be in the same position.

The Court: All right. Well, it may be a quirk of fate. I suspect it's not. But it may be a quirk of fate that he was in the house and the other brother wasn't. But he was in the house. He knew there was a gun. And it certainly was foreseeable that there would be a gun there. So, I'm going to overrule your objection to Paragraph 31.

All right. 33 talks about the four level upward adjustment as an organizer and leader.

Mr. McGuire: Yes, Your Honor.

The Court: Okay. Tell me about that.

Mr. McGuire: We discussed the law in this. The steerer, I think that's exactly what he was. He certainly had no control over any drugs. He certainly had no -- he wasn't directing others as this enhancement, I think what it's intended to do. He had no control over anyone else.

If anyone was the organizer or leader of this offense, it was the confidential informant. He's the one who started the whole ball rolling and kept persistently, aggressively encouraging James Smith and Jimmie Smith to commit this offense over a period of a whole year before it ever happened.

I believe under those fact circumstances, there's no way you can say Jimmie Smith is an organizer or a leader. At the most--and I don't even think this applies --he could be considered a manager/supervisor, but I don't believe that he even accomplished that. He was not controlling anyone. This was--these were all people who were operating independently. And I believe that the commentary for the guidelines discuss the factors the Court should look at as the exercise of decision-making authority. I don't believe he had any decision-making authority

over anybody. He certainly didn't decide what price was going to be asked for the drugs, what they would be willing to pay, what the seller would be wiling to offer for it. He didn't control where the drugs were. He had no idea if this person, in fact, did have any drugs. That goes to the factors of whether he's an organizer or a leader or a manager or supervisor.

Claimed right to a larger share of the fruits. He was just going to be paid a referral fee, a commission. That's certainly not a larger share of the fruits. It's the smaller share of the fruits.

Degree of participation of the planning or organizing the offense. We believe the active--the aggressive encouragement over a period of a full year by the confidential informant is the person who's organizing and pushing this whole thing forward, not Mr. Smith. The fact that it took so long for this to happen I think argues against his having any planning or organizing of the offense. And I believe he exercised no control or authority over anyone else. His brother brought him into this deal. And certainly the other codefendants, Collazo and Sayles, were acting independently. That's why the holding in the *Sostre* case and the other cases that are cited, *Graham*, talk about when you're just a go-between or a bellhop or a concierge, you're not an organizer or leader. I think logically that that's fairly clear.

The Court: Mr. Cook, response.

Mr. Cook: Your Honor, in this case the defendant was the primary person involved in setting up this deal. The deal does not go back a year prior to this date. Probably about four to six months at the most was the first contact in any way of discussing any type of narcotics transaction, around Thanksgiving of 1999.

The defendant James Smith was in custody--the co-defendant James Smith was in custody with the confidential informant. They got to be friends in the exchange of letters that you have, Your Honor.

James Smith stated that his brother, Jimmie, could probably hook him up with a deal; and once everyone was out of jail, they decided to do that. James Smith was the driving force, the person who all the contacts were made through--not through, but the decisions were made by. He did set the price and discuss price. He also stated that he was the man that the money would go through and he was the one that the undercover officer should talk to.

The number of people involved in this case, the undercover; the confidential informant; Glen Palmer, who was recruited to get the cocaine but was unable to do so; Arce and Collazo, who did provide the cocaine and put it on the table the

day of this incident; Donshay Sayles, the son-in-law of the defendant's girlfriend, if I remember correctly, some relation like that, who was contacted by this defendant and put together the drugs at that location, in fact, his own house where he stated that we need to hurry this up because my mom is coming home. And, lastly, James Smith, who in his statement stated that this defendant called him on the day of the deal and said he needed a ride and directed him where to go and how to--where to go as far as they went from Shoney's over on 610 near the Astrodome and ended up at a location out in Southwest Houston where the deal actually went down.

As far as the defendant's control of price, defendant stated on the 9th when this deal was coming to a completion, quote, "I'm gonna try--I'm gonna tell you something. Now, it is not--now, it might not be six. I told him at the most it will be--it might be five fifty," referring to the price per ounce of crack cocaine being 550 to $600.

Jimmie Smith also stated, "That's just what--that's what I had in mind. I just wanted to hear it from you. You come to me. 'Cause, see, I know what he told me. He told me 25. Now, that's what I made."

Defendant goes on to state in reference to a question about who was to be shown the money, the defendant stated, "Me. I'm the only somebody. I'm the only somebody you got to deal with."

The brother says, "You only gonna deal with him. It gonna be y'all, ain't nobody else. Y'all gonna do the dealin'."

And Jimmie says, "Just me."

Clearly he's the one in the lead.

\*           \*           \*

Mr. McGuire: I think it's clear from the police officer's testimony that he was going to be paid what's a commission. I think I can perhaps proffer as an expert in drug conspiracy prosecutions in this district the average price for a kilo of cocaine is somewhere between 16 and $18,000, roughly approximate to the 15,000 that was discussed here.

Something around the range of $3,000, which was the price that was going to be split between James Smith and Jimmie Smith is--and I think it's quite clear that that is typical of a commission. That's not something you pay to someone who's directly making the profit from selling the cocaine directly and that price is

25

reflected. It's the payment for the setup, as the officer testified.

I believe that clearly is the role of the steerer, go-between, concierge, bellhop, go out and find somebody to bring back who will sell something. Why did it take a year to set up--at least six months, as Mr. Cook admits, to set up a relatively small deal. That's a long time. If he was a big boss or a kingpin or had all these people working for him, you would imagine he could get it set up in a couple of hours.

I believe that argues strongly against him being an organizer/leader. He's just really a gofer, a bellhop or concierge, as the *Graham* case stated. And that's why we believe, Your Honor, that that enhancement is not applicable in this case. It's not factually accurate.

The Court: All right. Mr. Cook.

Mr. Cook: Your Honor, the defendant did direct the actions of numerous people, his brother, Donshay Sayles, Mr. Collazo, Arce, Glen Palmer, the undercover officer, and the confidential informant.

The defense counsel characterizes it as a fairly small deal or a relatively small deal, approximately 1 kilo of crack cocaine. He referred to cocaine. Crack cocaine is a different beast entirely, and the sentencing guidelines take that into account. A smaller amount of crack cocaine in the scheme of that business is much greater than if it were in the form of powder, the way it affects the streets and everything else. Twenty-five cookies of crack cocaine is not a relatively small deal. It's a large deal.

The payment of the defendant of $3,000 on the front side from the purchaser is not unusual. Whether or not he was scheduled to get anything on the backside from the seller, we'll never know. The defendant's own words set him up as what his role is. "I'm a master chef. That's just what, that's what I had in mind. He told me 25. Now, that's what I made. I'm gonna try--I'm gonna tell you something. Now, it might not be six. I told him at the most it'll be six. It might be five fifty, setting the price of the cocaine."

"Me, I'm the only somebody. I'm the only somebody you got to deal with. Just me."

Is it just one incident where he happened to set it up? "I know," quoting the defendant, "I know, I know at least four or five people that if one don't show, I ain't got no problems going to the next one. You understand me?"

Is he new to the business? Is this his only time, Your Honor? "'Cause see, I'm

a [sic] see it before you. See, I don't want no bullshit in my game, man. Like I say, I ain't new to this here. I been doing this here back in 1972. What's that? 28. That's over--that's what, 28 years ago. You understand me?"

His own words destroy that argument, Your Honor. He was setting this up. He was the major player. The other people acted at his direction.

Mr. McGuire seems to want to make an argument that it's not a military command situation where everybody answers directly up the chain of command. That's not the drug business. But this is the individual who brought all these people together to set up a sale of cocaine. They were there only because officers doing their job made contact with him and he contacted all the others to bring the situation together. If he had walked away, they never would have been there. He brought it together. He managed them, he organized them, and set this deal up.

The Court: Okay.

Mr. McGuire: And again, Your Honor, I guess more important--we're going to belabor this to death--but the factors that the guidelines commentary direct us to look at is exercise decision-making authority. All the statements that Mr. Cook is referring to in that one transcript are clearly puffery. The 25 cookies, where were they? They never showed up. That wasn't what was produced.

In the scheme of things, the amount that was produced in the courts--here in these federal courts in Houston is small. Again, look at how long it took to set this up, six months. That's unusual. At the minimum six months. Really it started a year ago. That's not someone who's a boss, who gets stuff down quickly.

His statement that he would find it from one person or another is indicative of the role of a steerer, someone who's an errand boy, go fetch me--someone who can get here, there. I'll find somebody eventually. He does find somebody, but that's really the role of a steerer, a gofer.

The Court: Well, Mr. Cook has convinced me that he was a leader/organizer; and I'm going to overrule your objection.

*                           *                           *

The Court: All right. I think where we were is you were--Mr. Smith's testimony was to show me why he was not a manager.

Mr. McGuire: Yes, Your Honor, that's correct. And I believe even the statement that he wrote corroborates his understanding that he was going to receive $1,500,

not the full $3,000, which again I would argue is indicative of his role being that of a gofer, of a steerer, someone going out and finding somebody and we'll give you a little commission to do it, not a manager of a group, not someone who is exercising authority over others.

The other parties involved in this case were acting independently and negotiating independently. He was asked and said had to go here and nobody had it and had to go there and nobody had it and, finally, went to the third place and somebody had it, but it's not the role of an organizer or a leader, I believe, as the guidelines and the commentary discusses.

*          *          *

The Court: All right. Well, it seems to me like he was. I mean, it seems to me like drug deals take different forms and this particular drug deal, it seems like Mr. Smith--I think that the agent's--that's the HPD officer's testimony was credible and I find that he did have the position of manager or organizer. So, I'm going to overrule your objection to 33, Paragraph 33.

And now have we gone to the coercion and duress?

*          *          *

Mr. McGuire: It's been a while since I've looked at it. I cited the *Garza-Juarez* case, Your Honor, out of the Ninth Circuit, which discussed a fact situation that's very similar to this, where 5K2.12 was applied for the coercion, duress, where you have very aggressive pursuit of a person who eventually becomes a defendant in the case. And I think the evidence shows that if he had not been pursued, he probably would have never done this offense. He was working at the time. And that's how he was making his living. You don't go to work starting at 6:00 o'clock in the morning or 7:00 o'clock in the morning at a plastic factory if you're a big drug dealer. And that the pursuit of the defendant by the confidential informant was unusual and extreme, I think, of the cases certainly that I've seen.

And the--as Mr. Smith has testified, when he originally on the 10th said--when that deal fell through and he said, "Listen, I don't want to do this anymore. I'm tired of messing around with this. It's been six months and you've been after me." And then he was told by that informant that, hey, you've got to help me out because I'm going to lose my family business. That's exactly the kind of moral suasion mentioned by the Supreme Court in the entrapment cases, *Sorrels* and the last one in '91, '92--I forget--the name escapes me right now--where you use a non-criminal motive to encourage someone to commit a criminal offense. And I believe this takes it out of the normal case and it's the kind of pressure that I think

28

should warrant a departure in this case. It was unusual, the extent of it, the continuous phone calls and the length of it until he finally did it. Eventually he did break down. That's why he pled guilty. Otherwise, he would have, you know, gone to trial, but he admitted he did it. But this is another, I think, factor the Court should take into consideration.

*     *     *

The Court: All right. Well, perhaps, but I don't believe it takes it out of the heartland, so I'm going to deny your motion for downward departure.

*     *     *

The Defendant: Yes, ma'am. I would like to say, Your Honor, if I had never been coerced into trying to help someone that I thought--I knew what I did was wrong, don't get me wrong. I knew that and I did that knowingly. But as far as for being a drug dealer, I'm not.

If it hadn't had been for this guy here, I never would have been in that position in the first place. He called and called and called asking me for help. And me knowing, knowing that it was wrong, what I was going to do, but I was--I was trying to help this man save his family business and this is what I--and this is what happened to try to save one man.

I'm not a drug dealer. This man called me on my job to get me to do what I did for him. I left my job early. I took off to call myself helping this guy. And it was--he was setting me up all along, and he knew I wasn't selling drugs. They knew I wasn't selling drugs. Because after talking to him back in November and December, I know they had begin to watch me. So, they could tell you I wasn't selling drugs. If I had been, they would have stopped me.

I worked at a chemical company, and they take drug tests. Sure, I used drugs, but I wasn't selling drugs.

And Collazo, I never met that guy in my life until the day that Bush, Officer Bush and I walked into that house. That's the first time I had ever seen that man in my life. I don't even know Palmer, the one that they say I recruited. I don't know him. I don't know Collazo. I don't know Arce. Arce and I was in the living room sitting and watching TV while Bush and Collazo was in the kitchen making the transaction. And Bush sat there on that stand and told you that he and I made the transaction. I never, I never made any--I don't even know what he was going to offer the guy or whatever it was that he was going to get. I don't even know how much drugs was going to be there.

I took him from Point A to Point B. And that was my role. Now, all this other that they've given me, they've given it to me, but I admit I did take him from Point A to Point B, not to buy drugs from me, but in hopes that I could find someone else that he could buy drugs from. And if you'd get him on that stand, if he tell you the truth, he will tell you that. He know it.

*    *    *

The Court: All right. Mr. Smith is before the Court for sentencing as a result of his conviction for aiding and abetting possession with intent to distribute 50 grams or more of cocaine base. This is his first federal conviction, but he has 12 prior convictions at the state level. Of those 12 convictions, 4 involve illegal drugs, including 2 crack felony cocaine convictions. He's also been convicted of a felony offense for tampering with physical evidence.

His prior convictions have not been crimes of violence, but the instant offense did place law enforcement officials in serious danger. And he himself suffered multiple gunshot wounds as a result of the instant offense.

Based on the gravity of [the] instant offense and that the defendant is deemed to have had an aggravated role in the offense, I believe that a sentence at the middle of the guideline imprisonment range is appropriate to adequately meet the sentencing objectives of punishment, incapacitation, and deterrence. (Document No. 156, pp. 18-21, 24-30, 43-47, 65-70, 73-74).

In sum, the record shows that at Smith's Rearraignment Hearing, Smith acknowledged the minimum and maximum penalties, knew that the Judge would decide his sentence, stated that his plea was voluntary, and that he was satisfied with his attorney's services. When Smith entered his guilty plea, he acknowledged that he could be sentenced to life and that the sentencing decision was entirely up to the Judge. Smith has failed to demonstrate that his guilty plea was not knowing, intelligent, and voluntary. In addition, Smith has not overcome the rule under *Strickland* that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689

(quotations omitted). Contrary to Smith's contentions, the record shows that his counsel was familiar with the facts and case law. Counsel negotiated a plea which resulted in Smith not receiving a mandatory life sentence. In addition, by timely entering a guilty plea and accepting responsibility for his actions, Smith was eligible for a three level reduction for acceptance of responsibility. Moreover, counsel advised Smith that regardless of whether he proceeded to trial or pleaded guilty, the calculation of Smith's guideline sentencing range would include a two point enhancement for possession of a firearm and a criminal history score of at least IV. With respect to an enhancement based on his leadership role in the offense, counsel opined that based on his interpretation of case law, Smith should not be eligible for an organizer/leader enhancement. Finally, counsel moved for a downward departure based on the unfairness of the four level organizer/leader enhancement when compared to the sentence imposed by the Court on Smith's brother and co-defendant, James Smith. The Court overruled counsel's objections, and on appeal, the Fifth Circuit affirmed the four level enhancement based on Smith's role in the offense. Because Smith has not shown that his counsel's performance fell below that of *Strickland*, no relief is available on Smith's ineffectiveness claims.

## IV. Conclusion

Based on the foregoing, the Magistrate Judge RECOMMENDS that Movant Jimmie Smith's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 165) be DENIED, and that the United States's Motion to Dismiss (Document No. 170) be GRANTED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5,

S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208 and a copy must be delivered to the Chambers of Judge Harmon, Room 9114 and to the Chambers of Magistrate Judge Stacy, Room 75257, Federal Building, 515 Rusk, Houston, Texas 77002.

Signed at Houston, Texas, this 13th day of September, 2004.


FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE